Eastern Dis'ct
April, 1827

---

*BALFOUR vs. CHEW.*

APPEAL from the court of the third district.

PORTER J. delivered the opinion of the court. This case commenced by an application for an injunction, to prevent the defendant selling certain slaves mentioned in the petition, which the plaintiff alleges to be her property The answer denies her title, and asserts that the defendant had seized the negroes in consequence of a mortgage given on them by the husband of the petitioner.

The real difficulty in the case is, whether the slaves were the property of the husband or wife; and its solution depends on the effect of certain transactions which took place in North Carolina; from which state, the parties, long after their marriage, moved into this. It is admitted the slaves were the property of the father of the petitioner; and it is contended, on the part of the wife, that the title remained in him, until after she and her husband removed into this state. On the part of

The copy of the probate o a will is the copy of a judicial proceeding, which must be certified under the act of congress of 1790.

5NS 517
121 834

the defendant, it is urged, that the negroes were conveyed to the wife while she lived in North Carolina, by gift from her father; and that, in consequence of a title vesting in her while there, the husband became the owner of them before he came into Louisiana, and that they are subject to his debts.

The wife, in support of her claim, produced the record of the last will and testament of her father, made since she came into this state. It purported to have been admitted to probate in Bulie county, North Carolina. The reading of it was objected to by the defendant, on the ground that it was not certified according to law. The court sustained the objection, and the plaintiff excepted.

In this court, the objection has been maintained, on the ground that this was not the copy of a *judicial proceeding*, which could be certified under the act of congress, passed in the year of 1790; but that it was the record or exemplification of an office book, not appertaining to a court, which should have been proven in the manner directed by the law of 1800, supplementary to the act already referred to. *Ingersoll's Dig. (ed.* 1825,) 298 & 299.

We are clearly of opinion, that the objection is unsound.   The admitting a will to probate, is certainly not a ministerial act.   It is a judicial proceeding; and the record of it, cannot be called a book not appertaining to a court.   The certificate given here, most certainly proves the contrary.   It designates the *term* at which the will was proved—it states the proof to have been made in *open court*, and that it was *ordered* to be recorded.

Another objection has been made in this court, which, for aught we can learn from the bill of exceptions, was not made in the court below; namely, that the clerk does not set out at length, the oaths of the witnesses proving the will; but has stated the will was proved by the oaths of the witnesses therein mentioned—or, in other words, that he has substituted his conclusion of what was proved, for the proof itself.

If this was a good reason to reject the will, we would hesitate to give the defendant the benefit of the objection.    He should have opposed the introduction of the proof *on that ground*, and have given his adversary an opportunity o shewing, that by the laws of that state, it wa: not necessary to insert the oaths of the witnesses who prove a will, at length, on the record.

EasternDis't
*April,* 1827.

BALFOUR
*vs.*
CHEW.

The principle on which the defendant opposes the reading of the instrument, is a correct one. Clerks are only authorised to give and certify copies; and as they are merely ministerial officers, they have no right to state what has been done, in any other manner but by furnishing a transcript of the record of what was done. But in the case before us, we see no ground to apply this doctrine. The statement at the bottom of the will, purports to be an extract from the records of the court. We are bound to believe, as the clerk has told us, that it is a *true copy;* and if it be, we are directed by the act of congress, to give it the same faith and credit, it had in the state from whence it came. It lies on the defendant to shew, that it was improperly admitted to record. This, he has not done; and if he had, so long as the judgment of that court stood unreversed by which it is ordered to be recorded, we could not refuse it effect here. *Smoot &* *al.* vs. *Russell,* 522, *vol. N. S.*

With this view of the correctness of the judges opinion in relation to the evidence, as the cause was tried by a jury, the most regular course would be to remand it for a new trial; but as both parties have pressed us to give a fi-

nal decision, and the principal question is one of law, not of fact, we shall examine the case on its merits.

Some of the negroes claimed by the plaintiff in this suit, were sent by her father to the house of her husband some time after her marriage, and have remained in his possession ever since. Admitting for a moment there were no evidence to take this case out of the presumptions which the laws of that state raise on such a transaction, the consequence would be that the property would vest in the husband. This has been satisfactorily shewn to be the rule in North Carolina. 1 *Haywood*, 97. 2 *ibid*, 72. But in opposition to this rule, which appears clearly established by the decisions of the courts of that state, the counsel for the plaintiff has produced an act of its general assembly, passed in the year 1784, by which it is required that deeds, or gifts of any estate, shall be proved in due form and recorded; and it is further declared, that deeds of gift not authenticated, and perpetuated in the manner prescribed by the act shall be null. He has also read cases from the same book, relied on by the defendant, that gifts, by parol, are considered void and of no effect.

These decisions, which, at first blush, appear to be contradictory, on a closer examination, are easily reconciled with each other. The cases in which gifts by parol have been considered good, arose between the donor or his representatives, and the donee. Those in which such conveyances have been held bad, were decided on a contest between the donee and creditors, or subsequent purchasers. The words of the act of 1784, do not require all deeds of gift to be reduced to writing. They only render it necessary to record all those which are reduced to writing. But the courts of North Carolina, from a conviction of the intention of the legislature, as evidenced by from the preamble to the statute, have held, that as to creditors, or subsequent purchasers, such deeds were null, and could have no effect. This distinction between third parties, and the donor or his representatives, is clearly established by two cases not cited in argument, which are reported in 2 *Haywood's N. Carolina Reports;* 87; and 3 *Haywood's Tennessee Reports,* 4.

The position, then, which the wife has attempted to maintain here, that the property could not vest in her without a deed of gift, is wholly untenable. The title, though by parol,

EasternDis'ct
*April* 1827.

BALFOUR
*vs.*
CHEW.

vested immediately, and became subsequently *void*, if not registered; that is, voidable, at the instance of creditors, and subsequent purchasers. 3 *Haywood Tenn. Reports*, 4.

If, then, it was vested in *her* in North Carolina, it became the property of her husband there; and, consequently, was his, when he removed into this state, and as such, was properly seized by the sheriff, to satisfy an execution against him.

In opposition to the presumption of law, relied on by the defendant, that the slaves became the property of the husband by being sent, or delivered to the wife after marriage by her father, the plaintiff introduced parol evidence to shew that they were received as a *loan* and not as a *gift*.

The evidence on this head is, that the plaintiff intermarried with her present husband, about the year 1807; and that in the same year some negroes were lent by the father of the petitioner, and taken possession of by her husband. In the year 1807, the witness by whom the fact is stated, declares, that he went to Balie county, in North Carolina, with his step mother, the plaintiff, and that the day they were leaving her father's house, he called up two ne-

groes, Bridget and Tony, and said to the by-standers, "take notice, that I *lend* to my daughter, Nancy Balfour, these negroes, in the same manner that I have the other negroes, (alluding to those formerly delivered to her,) and in no other manner."

The last will and testament of the father, also shews that he disposed of the slaves which his daughter had received, as if they made a part of his property, he made a loan of them to her for life, and gave them, after her decease, in full property to her children.

The courts of North Carolina have decided " that when property is permitted to remain in possession of the son-in-law for a considerable length of time, it will be necessary to prove very clearly, that the property was only lent by the father, and that it was expressly and notoriously understood not to be a gift at the time." 1 *Haywood*, 98.

With regard to the two negroes received in the year 1820, we think the evidence fully proves they were delivered as a loan, and every publicity was given to that fact the case was susceptible of. The father, on putting them into possession of his daughter, called on the bye-standers to observe that they

were lent by him, and that the transaction

was to be understood in no other manner.

But in regard to those which were sent to the wife immediately after the marriage, the proof is by no means satisfactory. The declaration of the father, years after the slaves were delivered, and at the time he was sending others away, cannot change the character of the original transaction. It is very weak proof of what it really was. The law of that country, so far as we have been able to gather it from the decisions of their courts is, that it must be *expressly* and *notoriously* understood at the time the property is delivered, that a loan, not a gift, is contemplated. Some of the decisions to which we have already referred, were made on facts where the father, as here, disposed of the slaves by last will and testament. But this declaration, on his part, that he had not given them to his daughter, was held insufficient to destroy the presumption which the law raised on the fact of his sending them after marriage, without an express understanding that they were lent, and not given. There is then no other proof of their being delivered as a loan, but that furnished by the witness Balfour; and his testimony is not strong

BALFOUR
*vs.*
HEW.

enough to bring the case of the plaintiff within the rules of law which governed the transaction in the country where it took place. He merely states, that some negroes were lent.— He gives none of the circumstances which attended the delivery; nor how he came by his knowledge. He does not say whether it was so understood in the place in which they lived, or whether the condition in which they were put into the possession of the husband and wife, was known only to their own family. The witness is a step-son of the plaintiff. This is certainly not proving that the slaves were expressly and notoriously delivered as a loan; and we conclude, as to them, the plaintiff has failed to make out title.

It is therefore ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed; and proceeding to give such judgment here as, in our opinion, should have been gven in the court below, it is ordered, adjudged and decreed, that the injunction granted in the case, so far as relates to the slave Bridget, be made perpetual; and it is further ordered and decreed, as it respects the other slaves mentioned in

the petition, that the injunction be dissolved,
and that the defendant pay costs in both
courts.

*Preston* for the appellant, *Watts & Lob-dell* for the appellee.